UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| YVONNE NORGAUER, | ) | CIV. 11-4124-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER DENYING DEFENDANTS |
| DONALD GRAHAM, M.D.; | ) | DONALD GRAHAM, M.D. AND |
| SANFORD CLINIC, | ) | SANFORD CLINIC'S MOTION FOR |
| f/k/a Sioux Valley Clinic, | ) | SUMMARY JUDGMENT AND |
| f/k/a Sioux Valley Physician Partners, a | ) | GRANTING SANFORD HEALTH'S |
| South Dakota corporation; | ) | MOTION FOR SUMMARY |
| SANFORD MEDICAL CENTER, | ) | JUDGMENT |
| f/k/a Sioux Valley Hospital, a South | ) | |
| Dakota corporation; | ) | |
| SANFORD HEALTH, | ) | |
| f/k/a Sioux Valley Hospitals and Health | ) | |
| System, a South Dakota corporation, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Yvonne Norgauer, brought suit against defendants, Donald Graham,

M.D., Sanford Clinic, Sanford Medical Center, and Sanford Health, alleging

Dr. Graham negligently left a sponge inside her abdomen following a gastric bypass

surgery. Dr. Graham and Sanford Clinic move for summary judgment, arguing that

Norgauer has not produced sufficient expert medical testimony to show that

Dr. Graham did not meet the applicable standard of care and that Dr. Graham

reasonably relied on a sponge count performed by nurses. Sanford Health moves for

summary judgment on the grounds that it did not employ any of the medical personnel

involved in Norgauer's surgery. For the following reasons, the court denies the motion for summary judgment filed by Graham and Sanford Clinic and grants the motion for summary judgment filed by Sanford Health.

## BACKGROUND

The facts, viewed in the light most favorable to Norgauer, are as follows:

On July 14, 2003, Norgauer underwent a gastric bypass surgery performed by Dr. Graham. The procedure took place at Sioux Valley Hospital, which is now known as Sanford Medical Center. At the time of Norgauer's surgery, Dr. Graham was a physician-employee of Sioux Valley Clinic, now known as Sanford Clinic. A CT scan[1] performed prior to Norgauer's surgery indicated that no foreign bodies were present at that time. At the conclusion of surgery, Dr. Graham noted that the sponge and needle counts were correct. Following the surgery, Norgauer was discharged from Sioux Valley Hospital on July 19, 2003.

Norgauer moved to California in 2004, and on September 10, 2009, she saw her physician in California with a complaint of hardness in her umbilical area after lifting heavy objects. Norgauer's doctor ordered a CT scan of her abdomen, which detected evidence of a foreign body. On October 21, 2009, Norgauer underwent surgery

---

[1] A CT scan stands for computerized tomography, which "combines a series of X-ray views taken from many different angles and computer processing to create cross-sectional images of the bones and soft tissues inside your body." Mayo Clinic, http://www.mayoclinic.org/tests-procedures/ct-scan/basics/definition/prc-2001461 0 (last visited April 3, 2014).

performed by Dr. Albert diVittorio, who removed the foreign body later identified as a laparotomy, or lap, sponge.[2] Norgauer maintains that the only possible source of the sponge in her abdomen is the July 14, 2003, surgery performed by Dr. Graham.

Following the removal of the sponge from her abdomen, Norgauer filed suit in this court. In Count I, Norgauer alleges that Dr. Graham was negligent in failing to remove the sponge during her surgery. In Count II, Norgauer claims Sanford Clinic is liable for Dr. Graham's negligence because it employed Dr. Graham. In Count III, Norgauer claims that Sanford Medical Center is liable for the negligence of its operating room staff in performing an incorrect sponge count. In Count IV, Norgauer claims that Sanford Health is liable for the negligence of its employees. Dr. Graham, Sanford Clinic, and Sanford Health move for summary judgment. Sanford Medical Center does not move for summary judgment on the claim in Count III.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of her case on which she bears the ultimate

---

[2] A laparotomy sponge or laparotomy pad is a pad made from several layers of gauze folded into a rectangular shape regularly used in surgeries. Dictionary.com, http://dictionary.reference.com/browse/laparotomy+pad (last visited April 8, 2014).

3

burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is not appropriate if there is a factual dispute that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

A federal court sitting in diversity applies the law of the state in which it sits, which here is South Dakota. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007).

## DISCUSSION

### I.   Dr. Graham

### A.   Expert Testimony

A plaintiff in a medical malpractice case has the burden of showing that the defendant acted without the care or skill ordinarily exercised under similar circumstances by physicians in good standing engaged in the same line of practice in the same or similar locality. *See Block v. McVay*, 126 N.W.2d 808, 811-12 (S.D. 1964)

4

*overruled in part on other grounds by Shamburger v. Behrens*, 418 N.W.2d 299 (S.D. 1988); SDPJI 20-70-30. Under South Dakota law, "[t]he general rule in medical malpractice cases is that negligence must be established by the testimony of medical experts." *Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D. 1986). This requirement applies to each element of a plaintiff's cause of action. *Koeniguer v. Eckrich*, 422 N.W.2d 600, 601 (S.D. 1988).

South Dakota allows plaintiffs to demonstrate negligence by applying the doctrine of res ipsa loquitur, although that doctrine should be invoked sparingly. *Wuest ex rel. Carver v. McKennan Hosp.*, 619 N.W.2d 682, 688 (S.D. 2000) (quoting *Van Zee v. Sioux Valley Hosp.*, 315 N.W.2d 489, 492 (S.D. 1982)). Three elements must be present to warrant application of res ipsa loquitur: (1) the instrumentality which caused the injury must have been under the control of the defendant or the defendant's servants; (2) the accident must be of a type that does not happen absent negligence; and (3) the plaintiff's injury must result from the accident. *Id.* In medical malpractice cases, the negligence must be established by expert testimony unless it is the kind of negligence "within the realm of laymanistic comprehension." *Id.*

Dr. Graham contends that Norgauer cannot introduce evidence sufficient to support a prima facie case of medical malpractice under South Dakota law because she has not provided an expert opinion on the standard of care required of a surgeon. Docket 44 at 2-3. Norgauer responds that expert testimony is not required because the

duty of a surgeon to remove all sponges from a patient's body is within the knowledge

of a layperson. Docket 41 at 7-8.[3] The South Dakota Supreme Court has stated:

> "The question of duty arises frequently in cases of medical malpractice. Since a physician or surgeon normally undertakes only to exercise the skill and care common to the profession, there usually is not enough in a mistaken diagnosis alone, or the unfortunate choice of the wrong method of treatment, or the kind of accident or undesirable result which happens in spite of all reasonable precautions, to show the necessary lack of skill or care. What this means is that ordinarily laymen are not qualified to say that a good doctor would not go wrong, and that expert testimony is indispensable before any negligence can be found. Such decisions, together with the notorious unwillingness of members of the medical profession to testify against one another, may impose an insuperable handicap upon a plaintiff who cannot obtain the proof.
>
> There are, however, some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care. When an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe, or he suffers a serious burn from a hot water bottle, or when instruments are not sterilized, the thing speaks for itself without the aid of any expert's advice."

*Van Zee*, 315 N.W.2d at 492 (quoting Prosser, Law of Torts, 226-228 (4th ed. 1971)).

Thus, the South Dakota Supreme Court has found that expert testimony is not

---

[3] Separately, Norgauer raises a related evidentiary argument, contending that because leaving a sponge in a patient is an obviously negligent act within the common knowledge of a layperson, expert testimony on the standard of care is inadmissible. Docket 41 at 8-9. There is no motion to exclude any expert before the court at this time. Furthermore, Norgauer does not identify which opinion she feels is inadmissible, or on what specific grounds.

required in a medical malpractice action when a sponge is left in the patient's interior. Because that is the exact fact pattern at issue here, expert testimony is not required.

### B. Standard of Care

Even if expert testimony were required, Dr. diVittorio has provided an opinion on the standard of care. Dr. Graham contends that he did not breach the standard of care for a surgeon because he reasonably relied on the sponge count performed by the operating room staff. Dr. diVittorio, however, testified as follows:

> Q: Whose responsibility, Doctor, is it to make sure that foreign bodies, such as a laparotomy sponge, are not left in the patient?
>
> . . .
>
> A: The general procedure is for the nursing staff to keep track of the instruments and sponges, keep an accurate count and report, then, to the surgeon. The surgeon, in my experience, has the ultimate responsibility even though he doesn't actually do the actual count. So there is – it's a mutual responsibility, I believe.
>
> Q: And the surgeon in this case, in your opinion, had the obligation to at least search the abdominal cavity for any foreign bodies?
>
> . . .
>
> A: He's ultimately responsible. So if there is any question, he would have been – but most of us at the time of surgery do a quick check to make sure there is [sic] no foreign bodies or no instruments or sponges left.

Docket 40-5 at 2.

Dr. Graham contends that Dr. diVittorio's opinion on the standard of care cannot support Norgauer's claim because Dr. diVittorio later testified that on one

7

occasion he had left a sponge inside a patient, that the standard of care does not require a surgeon to personally perform a sponge count, and that a surgeon may reasonably rely upon the operating room staff to perform a sponge count. *Id.* at 3-4. The fact that Dr. diVittorio may have himself relied on a nurse's sponge count and left a sponge in a patient does not alter the fact that Dr. diVittorio has provided an opinion on the standard of care a surgeon must meet which could allow a jury to find that Dr. Graham breached the standard of care in this case. The opinions on the standard of care provided by Dr. diVittorio and Dr. Peter Kelly, an expert for the defendants, do not conclusively establish a standard of care under which a surgeon is relieved of all potential liability by relying on a sponge count. The conflict between the expert opinions of Dr. diVittorio and Dr. Kelly should be weighed by a jury. *Koeniguer*, 422 N.W.2d at 602-03 ("There is contradictory expert testimony as to whether the surgery, the infection or a combination of the two resulted in [the patient's] death. . . . A jury will have to make that factual determination.").

Dr. Graham also contends that Dr. diVittorio's opinion is based on the captain of the ship doctrine rather than his own alleged negligence. The captain of the ship doctrine imposed liability for negligent acts of operating room personnel on a surgeon rather than on a hospital because hospitals traditionally enjoyed charitable immunity. *See, e.g.*, *Willis v. Bender*, 596 F.3d 1244, 1262-64 (10th Cir. 2010) (explaining the captain of the ship doctrine). Dr. Graham points to Dr. diVittorio's testimony that "[t]he

8

surgeon, in my experience, has the ultimate responsibility even though he doesn't actually do the actual count." Docket 40-5 at 2. But Dr. diVittorio later stated that the surgeon and the operating room staff have "a mutual responsibility" and that a surgeon should usually perform a quick check to see if any sponges remain in the patient in addition to relying on the sponge count. *Id.* In this case, Norgauer is separately seeking to hold Sanford Medical Center liable for the alleged negligence of its operating room staff. Furthermore, Dr. diVittorio's opinion reflects a standard of care in which a surgeon has an independent duty, concurrent with that of the operating room staff's duty to correctly perform a sponge count, to ensure that no foreign bodies are left inside a patient. Therefore, Dr. diVittorio's opinion relates to potential negligence on the part of Dr. Graham himself and is not dependent on the captain of the ship doctrine.

Dr. Graham further argues that he is entitled to summary judgment because he was within the standard of care when he relied on the sponge count performed by the operating room staff. Docket 37 at 9. Dr. Graham portrays the testimony of Dr. diVittorio as "unequivocally" agreeing that Dr. Graham met the standard of care. Docket 37 at 9. But Dr. diVittorio's testimony as a whole is not as conclusive as Dr. Graham suggests. It would be possible for a jury to find, based on Dr. diVittorio's testimony, that a surgeon who closes a patient with a sponge still inside the patient violates the standard of care even when the sponge count is reported correct. This is

particularly true if reliance on the sponge count was not reasonable given the circumstances. A surgeon might unreasonably rely on the sponge count if the surgeon can still see a sponge in the surgical wound, or if the surgeon had an opportunity to notice that a removed sponge was missing a piece that presumably had been left behind in the patient. Reasonability and compliance with a standard of care are generally questions for a jury. *See Koeniguer*, 422 N.W.2d at 603 (Henderson, J., specially concurring) ("Summary judgments are, generally speaking, not feasible in negligence actions, the reason being that the standard of 'the reasonable man' must be applied to conflicting testimony . . . .").

Genuine conflicts exist regarding exactly when a surgeon may rely on a sponge count, and whether Dr. Graham properly did so in this case. Dr. diVittorio's deposition testimony provides a basis from which a jury could find that Dr. Graham did not meet the required standard of care applicable to surgeons. Consequently, summary judgment is denied to Dr. Graham. Because the court is denying summary judgment, it is unnecessary for the court to determine at this time whether a surgeon may delegate the duty to perform a sponge count, see Docket 41 at 10-11, or whether to apply a negligence per se theory as proposed by Norgauer, see Docket 41 at 12-16.

## II.   Sanford Clinic

Sanford Clinic argues that it is entitled to summary judgment because its employee, Dr. Graham, is entitled to summary judgment. Docket 37 at 9. Because the

court denies Dr. Graham's motion for summary judgment, it also denies Sanford Clinic's motion for summary judgment.

## III.   Sanford Health

Sanford Health contends that it did not employ any person involved in Norgauer's surgery. Norgauer accepts this contention and agrees that Sanford Health may be dismissed from this action. Docket 41 at 9 n.3.

## CONCLUSION

Dr. Graham has failed to show that there are no genuine issues of material fact for trial. Because Dr. Graham is not entitled to summary judgment, Sanford Clinic is not entitled to summary judgment. No disputes of material fact remain concerning Sanford Health. The other defendant, Sanford Medical Center, does not take part in the motion for summary judgment. Accordingly, it is

ORDERED that the summary judgment motion (Docket 36) as to Dr. Donald Graham and Sanford Clinic is denied.

IT IS FURTHER ORDERED that the summary judgment motion (Docket 36) as to Sanford Health is granted.

Dated April 16, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

11